## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| METROMEDIA STEAKHOUSES COMPANY, L.P., | ) Case No. 08-12490 |
| (MFW) JOST RESTAURANT FINANCING, INC., | ) |
| PUERTO RICO PONDEROSA, INC., and | ) Jointly Administered |
| PON REALTY I, INC., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF METROMEDIA STEAKHOUSES | ) |
| COMPANY, L.P., JOST RESTAURANT | ) |
| FINANCING, INC., PUERTO RICO | ) |
| PONDEROSA, INC., and PON REALTY I, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. No. 09-50102 (MFW) |
| | ) |
| JOHN W. KLUGE, THE TRUST DATED AS OF | ) |
| MAY 30, 1984, AS AMENDED AND RESTATED, | ) |
| JOHN W. KLUGE AS GRANTOR, AND JOHN W. | ) |
| KLUGE, MANUFACTURERS HANOVER TRUST | ) |
| COMPANY (NOW J.P. MORGAN CHASE BANK, | ) |
| N.A.) AND STUART SUBOTNICK, AS | ) |
| TRUSTEES, and JWK ENTERPRISES, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### MEMORANDUM OPINION[1]

Before the Court is the Motion of John W. Kluge, the Trust
Dated as of May 30, 1984, as Amended and Restated, John W. Kluge
as Grantor, and JWK Enterprises, LLC (collectively, the "Kluge

---

[1] "The court is not required to state findings or conclusions
when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P.
7052(a)(3). Accordingly, the Court makes no findings of fact and
conclusions of law but accepts the averments of the Complaint as
true in considering the Defendants' Motion to Dismiss.

VACATED

Defendants") to Dismiss the First and Third Claims in the

Complaint filed by the Official Committee of Unsecured Creditors

of Metromedia Steakhouses Company, L.P., Jost Restaurant

Financing, Inc., Puerto Rico Ponderosa, Inc., and Pon Realty I,

Inc. (collectively, the "Debtors"). As discussed below, the

Court will deny the Motion to Dismiss the First Claim and will

grant without prejudice the Motion to Dismiss the Third Claim of

the Complaint.


I.    BACKGROUND

Defendant John W. Kluge ("Kluge") is the principal owner,

Chairman, and President of Metromedia Company ("Metromedia").

Metromedia owns 97.02% of Metpon Acquisition, Inc. ("Metpon") and

is the ultimate parent of Metromedia Steakhouses Company, L.P., a

Delaware limited partnership ("MSC"). MSC is the parent of the

other Debtors. Metpon is the general partner and owns 0.5% of

MSC. Pon Holding Corp. is a minority limited partner of MSC.

In 1988, Metpon acquired Metromedia Steakhouses, Inc.

("MSI"), MSC's predecessor in interest. Sometime before 1990,

MSI borrowed approximately $190.5 million to finance the

acquisition of Bonanza Restaurant Company ("Bonanza") and

Ponderosa Franchising Company ("Ponderosa") (the "Acquisition

Financing"). MSI experienced net losses from 1987 through February 26, 1990.

On February 26, 1990, MSI entered into an agreement with third-party lenders (the "MSI Credit Agreement"), pursuant to which it obtained a $205 million term loan and a $20 million revolving credit facility to refinance the Acquisition Financing. The MSI Credit Agreement was secured by substantially all of MSI's assets. It contained financial covenants and other restrictive covenants. MSI continued to experience net losses in 1991 and 1992.

Effective December 31, 1992, MSI merged into MSC, changing it from a corporation to a limited partnership. (See Compl., Ex. J, Consolidated Financial Statements (Dec. 31, 1992 through Dec. 27, 1993) at 6.) For fiscal year 1993, MSC experienced a net loss of more than $61 million.

On November 30, 1993, MSC and Kluge entered into an agreement (the "Kluge Agreement") whereby Kluge advanced MSC $165.3 million represented by an unsecured promissory note (the "Kluge Note"), which was used to repay the balance due under the MSI Credit Agreement. The Kluge Agreement and Note provided for a fixed maturity date of November 29, 1998, and a set interest rate. The Kluge Agreement contained no restrictive or financial

3

covenants.  MSC was unable to obtain funds from third party lenders on similar terms.

MSC paid interest on the Kluge Note from 1993 until May 1, 2001, despite sustaining net losses during that period.  MSC's subsequent failure to pay interest for the next seven years (more than $51 million as of October 22, 2008) was a continuing event of default.  Nonetheless, Kluge never attempted to enforce his rights and remedies with respect to such default.  The Kluge Note was amended four times over a decade to extend its initial maturity date from 1998 to its final maturity date of December 31, 2010.  MSC recorded the debt in its financial statements as long-term debt.

On April 6, 2005, MSC and certain of its subsidiaries obtained a $15 million term loan from Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc. ("Merrill Lynch").  The loan contained negative and financial covenants and was secured by certain assets of MSC and its subsidiaries.  In addition, Merrill Lynch and Kluge entered into a subordination agreement, under which payment on all debt owed to Kluge was subordinated to payment on all existing and future debt owed by MSC to Merrill Lynch.

Since its inception, MSC has been highly leveraged, relying on the support of Kluge and affiliated entities to cover capital

4

expenditures and operating losses.  MSC's audited financial
statements for fiscal years 2004, 2005, and 2006 stated that "MSC
is economically dependent on the continued deferral of all
interest payments" on the Kluge Note.  As of October 22, 2008,
MSC owed Kluge approximately $225 million.

On October 22, 2008, the Debtors filed voluntary petitions
for relief under chapter 11 of the Bankruptcy Code.  On November
6, 2008, the Official Committee of Unsecured Creditors (the
"Committee") was appointed.  On February 3, 2009, the Committee
initiated this adversary proceeding seeking, <u>inter alia</u>, to
recharacterize the debt MSC owes to Kluge as an equity investment
or, in the alternative, to equitably subordinate the Kluge
claims.  On February 19, 2009, the Kluge Defendants filed a
Motion to Dismiss the recharacterization and equitable
subordination claims.  The Committee opposes the Motion.  The
matters have been fully briefed and are ripe for decision.

II.  <u>JURISDICTION</u>

This Court has jurisdiction over this adversary proceeding
pursuant to 28 U.S.C. §§ 1334(b), 157(b)(2)(A) & (O) (2006).

III. <u>DISCUSSION</u>

A.  <u>Rule 12(b)(6) Standard of Review</u>

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which is incorporated by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, serves to test the sufficiency of the factual allegations in the complaint.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993); Paul v. Intel Corp. (In re Intel Corp. Microprocessor Anti-Trust Litig.), 496 F. Supp. 2d 404, 407 (D. Del. 2007) ("The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.") (citation omitted).  The complaint must contain either direct or inferential factual allegations that are enough to raise a right to relief above the speculative level.  Twombly, 550 U.S. at 555. See also Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 322 (3d Cir. 2008) ("The complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.").

In deciding a motion to dismiss, the Court "must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff."  Carino v. Stefan, 376 F.3d 156, 159 (3d Cir. 2004).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).

B.   Recharacterization v. Equitable Subordination

Both recharacterization and equitable subordination are grounded in a bankruptcy court's equitable authority to ensure that substance does not yield to form and that technical considerations do not hinder substantial justice. See Pepper v. Litton, 308 U.S. 295, 305 (1939).  However, the remedies address distinct concerns.  See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.), 432 F.3d 448, 454 (3d Cir. 2006). Recharacterization focuses on the proper characterization of an investment as either a debt or an equity interest or, stated differently, whether a debt actually exists.  Id. at 455 (citation omitted).  See also Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs., Ltd. P'ship), 240 B.R. 124, 137 (Bankr. D.D.C. 1999) ("The debt-versus-equity inquiry is not an exercise in recharacterizing a claim, but of characterizing

7

the advance's true character.") (emphasis in original).  In

contrast, "[e]quitable subordination is apt when equity demands

that the payment priority of claims of an otherwise legitimate

creditor be changed to fall behind those of other claimants."

SubMicron, 432 F.3d at 454 (citations omitted).

     C.   The Claim for Recharacterization

     While recharacterization is not expressly mentioned in the

Bankruptcy Code, courts have recognized and applied the doctrine

under the bankruptcy court's general equitable powers.  See

SubMicron, 432 F.3d at 455-56.  See also Fairchild Dornier GMBH

v. Official Comm. of Unsecured Creditors (In re Dornier Aviation

(N. Am.), Inc.), 453 F.3d 225, 231 (4th Cir. 2006) ("In light of

the broad language of § 105(a) and the larger purpose of the

Bankruptcy Code, we believe that a bankruptcy court's power to

recharacterize [debt as equity] is essential to the proper and

consistent application of the Code."); Bayer Corp. v. MascoTech,

Inc. (In re Autostyle Plastics, Inc.), 269 F.3d 726, 748 (6th

Cir. 2001).  But see Unsecured Creditors' Comms. of Pac. Express,

Inc. v. Pioneer Commercial Funding Corp. (In re Pac. Express,

Inc.), 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986) (rejecting

recharacterization as an available remedy).

     In the Third Circuit, "the determinative inquiry in

classifying advances as debt or equity is the intent of the

8

parties as it existed <u>at the time of the transaction</u>."

<u>SubMicron</u>, 432 F.3d at 457 (emphasis added).  Courts attempt to

discern "whether the parties called an instrument one thing when

in fact they intended it as something else." <u>Id.</u> at 456.  The

parties' intent may be inferred from: (1) what they say in their

contracts, (2) what they do through their actions, and (3) the

economic reality of the surrounding circumstances. <u>Id.</u> ("The

party infusing funds does so as a banker (the party expects to be

repaid with interest no matter the borrower's fortunes;

therefore, the funds are debt) or as an investor (the funds

infused are repaid based on the borrower's fortunes; hence, they

are equity).").

In <u>Exide Technologies, Inc. v. Official Committee of</u>

<u>Unsecured Creditors</u>, the Court listed eleven factors generally

considered by courts in determining whether recharacterization is

proper:

> (1) the names given to the instruments, if
> any, evidencing the indebtedness; (2) the
> presence or absence of a fixed maturity date
> and schedule of payments; (3) the presence or
> absence of a fixed rate of interest and
> interest payments; (4) the source of
> repayments; (5) the adequacy or inadequacy of
> capitalization; (6) the identity of interest
> between the creditor and the stockholder; (7)
> the security, if any[,] for the advances; (8)
> the corporation's ability to obtain financing
> from outside lending institutions; (9) the
> extent to which the advances were

> subordinated to the claims of outside
> creditors; (10) the extent to which the
> advances were used to acquire capital assets;
> and (11) the presence or absence of a sinking
> fund to provide repayments.

299 B.R. 732, 740 (Bankr. D. Del. 2003) (citing Autostyle

Plastics, 269 F.3d at 750-53). However, these factors are

considered only as aids to determine the parties' intent. "No

mechanistic scorecard suffices." SubMicron, 432 F.3d at 456.

See also Official Comm. of Unsecured Creditors v. Tennenbaum

Capital Partners, LLC (In re Radnor Holdings Corp.), 353 B.R.

820, 838 (Bankr. D. Del. 2006) (stating that the intent of the

parties is determined by "a common sense evaluation of the facts

and circumstances surrounding a transaction").

The Court must therefore evaluate the facts as alleged by

the Committee, in the context of the eleven factors, and look

beyond the form of the transaction to determine the parties'

actual intent and whether the Committee has pled "sufficient

factual matter" to state a plausible claim for recharacterization

of Kluge's advances to MSC in 1993. See Iqbal, 129 S. Ct. at

1949.

"The absence of notes or other instruments of indebtedness

is a strong indication that the advances were capital

contributions not loans." Autostyle Plastics, 269 F.3d at 750.

Here, the transaction between MSC and Kluge was memorialized as

10

debt in documents entitled "Credit Agreement" and "Promissory Note." (Compl., Ex. B & C.)[2] Further, the balance under the Kluge Note was recorded as a long-term obligation in MSC's audited financial statements. (Compl., Ex. D & J.) See SubMicron, 432 F.3d at 457 (noting that evidence of the parties' intent to create a debt transaction may be found in financial statements, outside the lending documents).

"The absence of a fixed maturity date and a fixed obligation to repay is [also] an indication that the advances were capital contributions not loans." Autostyle Plastics, 269 F.3d at 750. The Kluge Agreement and Note provided for a fixed maturity date (November 29, 1998) and for a fixed obligation to repay the principal, plus interest. (See Kluge Note ¶ 1, Compl., Ex. C.)

With respect to the first three factors, the Committee acknowledges that the Kluge Agreement and Note are respectively titled a "Credit Agreement" and "Promissory Note" and that both contain a maturity date and a fixed interest rate. The Committee contends that notwithstanding the documentation, the payment terms were ignored: MSC has failed to pay more than $51 million

---

[2] See Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

in interest under the Kluge Note since May of 2001 and the initial maturity date was extended four times. Moreover, the Committee argues that MSC was economically dependent on the deferral of all interest payments and unable to repay the advances. Thus, the Committee argues that the advances under the Kluge Note, while called debt, were in fact an equity infusion.

"Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on." SubMicron, 432 F.3d at 456. Although MSC paid interest under the Kluge Note from November 30, 1993 until May of 2001, none was paid thereafter. Moreover, the maturity date was extended in April of 1998, when the "debt" was originally due, and three more times thereafter, because MSC was unable to repay it. (See Compl., Ex. J, Notes to Consolidated Financial Statements (Dec. 29, 1997 & Dec. 30, 1996) ¶ 9.) The Court concludes that the first three factors support a finding that the funds advanced by Kluge were debt. Nonetheless, the fact that the terms of the loan documents were not enforced provides a plausible basis for a finding that the advances were intended as an equity infusion.

With respect to the fourth factor (the source of funds used to make payments), the Committee argues that the repayment of the Kluge Note was contingent on the success of MSC's business. The

Committee alleges that MSC lost money every year for three years before the transaction in question, continued to sustain losses every year thereafter, and relied on the support of Kluge for capital expenditures and operating funds throughout the relevant period.[3] In addition, the Committee contends that MSC's audited financial statements for fiscal years 2004, 2005, and 2006 acknowledged that "MSC is economically dependent on the continued deferral of all interest payments" on the Kluge Note. The Committee argues that Kluge's actions are similar to those of the defendant in Aquino v. Black (In re AtlanticRancher, Inc.), 279 B.R. 411, 437 (Bankr. D. Mass. 2002). In Aquino, the court concluded that the transaction at issue had the substance and character of an equity contribution because the defendant made no effort to collect on a promissory note or to foreclose on the collateral. Id. at 437. The Court finds that the Committee has alleged sufficient facts to meet this factor.

With respect to the fifth factor (the adequacy of capitalization), the Committee alleges that MSC was undercapitalized prior to the transaction, on the date of the transaction, and thereafter. The Court finds that the Committee

---

[3] The Kluge Defendants acknowledge that Kluge and his affiliated entities made equity contributions to MSC of nearly $500 million from 1991 to 2000.

has alleged sufficient facts to meet this factor.

With respect to the sixth factor (whether the lender was a shareholder), the Committee alleges that Kluge was the indirect majority shareholder and an "insider" who maintained and exercised control over MSC through his equity ownership of Metromedia and his executive and director positions within Metromedia, Metpon, and Pon Holdings Corp.  The Committee also alleges that the advances under the Kluge Note were proportionate to Kluge's ownership of MSC.  See, e.g., Autostyle Plastics, 269 F.3d at 751 ("If the stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated.").  Thus, the Court finds that the Committee has alleged sufficient facts to meet this factor.

With respect to the seventh factor (whether the advances were secured), the Kluge Agreement and Note were not secured. "The absence of security for the advances is a strong indication that the advances were capital contributions rather than loans." Roth Steel Tube Co. v. C.I.R., 800 F.2d 625, 631 (6th Cir. 1986) (citations omitted).  Therefore, the Court finds that the Committee has alleged sufficient facts to meet this factor.

With respect to the eighth factor (ability to obtain financing from third party lenders), the Committee alleges that Kluge extended credit to MSC on extremely favorable terms,

14

without "standard" financial and other restrictive covenants, and that no bona fide third party lender would extend credit to MSC on such favorable terms. "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." Autostyle Plastics, 269 F.3d at 752. At the time of the transaction, the Committee asserts that MSC's ability to obtain credit from a third party lender was bleak because of the substantial net losses incurred by MSC and MSI and because of the existence of a large secured loan under the MSI Credit Agreement, which precluded the incurrence of additional debt. As a result, the Court finds that the Committee has alleged sufficient facts to meet this factor.

With respect to the ninth factor (the extent to which the advances were subordinated to outside creditors), the Committee admits that when the parties executed the Kluge Agreement and Note, the advances were not subordinated to any claims of outside creditors. The Committee alleges, however, that Kluge later contractually agreed to subordinate the advances under the Kluge Note to all existing and future debt of Merrill Lynch. (See Compl., Ex. H.) "[T]he fact that the defendants agreed to subordinate their participations to [other lenders] – a major

15

concession on the part of the defendants - is also a slight indication of equity." Autostyle Plastics, 269 F.3d at 752. Viewing the facts in the light most favorable to the Committee, the Court finds that the Committee has alleged sufficient facts to meet this factor.

With respect to the tenth factor (use of advances), the Committee acknowledges that the proceeds of the Kluge Note were used to repay the balance due under the MSI Credit Agreement, not to purchase capital assets. (Compl. ¶ 13, 15, 17.) "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." Autostyle Plastics, 269 F.3d at 752. The Committee contends, however, that the original funds advanced under the Acquisition Financing, which were repaid under the MSI Credit Agreement and later again under the Kluge Agreement, had been used to acquire the Bonanza and Ponderosa businesses. The Court concludes that the allegations of repayment of a loan the proceeds of which had been used to purchase capital assets may be a plausible basis for a finding that the advances were intended as an equity infusion.

With respect to the eleventh factor (sinking fund to repay the advances), the Committee does not allege there was a sinking fund to repay the Kluge Note. However, the presence of a sinking

16

fund is very unlikely because MSC was highly leveraged at all relevant times and economically dependent on the support of Kluge and his affiliated entities for capital expenditures and operating funds.  As a result, there is a plausible basis for a finding that this factor is met.

In sum, the Court finds that the Committee has alleged sufficient facts to allow the Court to draw the reasonable inference that the parties originally intended the Kluge advances to be an equity infusion which is sufficient to state a plausible claim for recharacterization.  Therefore, the Court will deny the Motion to Dismiss the Committee's claim for recharacterization.

D.    Claim for Equitable Subordination

The Kluge Defendants also seek to dismiss the Committee's claim for equitable subordination.  They argue that the Committee has failed to allege two of the three necessary elements of a claim for equitable subordination: (1) that Kluge engaged in inequitable conduct and (2) that the misconduct either caused injury to MSC's creditors or conferred an unfair advantage on Kluge.

Section 510(c) of the Bankruptcy Code authorizes a bankruptcy court to subordinate a creditor's claim "to the claims of other creditors, not equity interests."  Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns., Inc.), 554 F.3d 382, 414

(3d Cir. 2009). Equitable subordination is a remedial doctrine "designed 'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" Winstar, 554 F.3d at 411 (citing Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228, 233-34 (3d Cir. 2003) ("Citicorp II")).

The Third Circuit has held that, before a court may subordinate a creditor's claim, the following three conditions must be satisfied: "(1) '[t]he claimant must have engaged in some type of inequitable conduct;' (2) '[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination of the claim must not be inconsistent with the Bankruptcy [Code].'" Winstar, 554 F.3d at 411 (quoting Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th Cir. 1977) (originally articulating the three-part test), and citing United States v. Noland, 517 U.S. 535, 538-39 (1996) ("The District Courts and Courts of Appeals have generally followed the Mobile Steel formulation . . . .")).

"The inequitable conduct underlying equitable subordination may be 'unrelated to the acquisition or assertion of the particular claim whose status [is] at issue.'" Winstar, 554 F.3d

18

at 412 (citation omitted).  "[A] creditor's claim should only be subordinated to the extent necessary to remedy the harm caused by that creditor's misconduct, [but the Third Circuit has] never required the bankruptcy estate to quantify specific harms to the estate or other creditors."  Id. at 413.

"A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."  Winstar, 554 F.3d at 412 (citing Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1465 (5th Cir. 1991)).  The proponent of equitable subordination "bears the burden of presenting material evidence of unfair conduct . . . [that] the [insider] claimant then must [rebut by proving] the fairness of his transactions with the debtor."  Winstar, 554 F.3d at 412 (quoting Estes v. N & D Props., Inc. (In re N & D Props., Inc.), 799 F.2d 726, 731 (11th Cir. 1986)).

1.    Inequitable Conduct

The Committee argues that the Third Circuit does not require that the proponent of equitable subordination establish inequitable conduct before a claim may be equitably subordinated. See SubMicron, 432 F.3d at 462 ("We declined, however, to adopt the first generally recognized element [that the claimant must have engaged in some type of inequitable conduct] as a formal requirement for equitable subordination . . . .") (citing

19

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding
Unsecured Claims, 160 F.3d 982, 987 n.2 (3d Cir. 1998) ("Citicorp
I")).  In SubMicron, the Third Circuit explained that its
"hesitance to adopt an inequitable conduct requirement in
[Citicorp I] stemmed from [its] prior holding in Burden v. United
States, 917 F.2d 115, 120 (3d Cir. 1990), that 'creditor
misconduct is not [always] a prerequisite for equitable
subordination.'"  SubMicron, 432 F.3d at 462 n.16.  See also
Anchor Resolution Corp. v. State Street Bank & Trust Co. (In re
Anchor Resolution Corp.), 221 B.R. 330, 342 (Bankr. D. Del. 1998)
("The Plaintiffs do not argue inequitable conduct on the part of
the Series B Noteholders, and such conduct need not be found for
the Plaintiffs to be entitled to equitable subordination.")
(citing Burden, 917 F.2d at 120).

     In Burden, the Third Circuit addressed whether tax penalty
claims were subject to equitable subordination and found they
were.  917 F.2d at 116-19.  In 1996, however, the Supreme Court
addressed this issue.  Noland, 517 U.S. at 538-40 ("In keeping
with pre-1978 doctrine, many Courts of Appeals have continued to
require inequitable conduct before allowing the equitable
subordination of most claims, although several have done away
with the requirement when the claim in question was a tax
penalty.") (emphasis added).  The Supreme Court rejected the

reasoning of those cases, including Burden, which had upheld "no-fault" equitable subordination of tax penalty claims.  Id. at 543.  See also Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.), 420 F.3d 53, 62 n.4 (1st Cir. 2005) (noting that pre-Noland cases were specifically rejected); Anchor Resolution, 221 B.R. at 342 ("[Burden's] holding[] on the subordination issue [is] no longer good law in light of United States v. Noland . . . .").

The Supreme Court did not, however, address "whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated."  Noland, 517 U.S. at 543. See also Citicorp I, 160 F.3d at 987 n.2 ("Burden involved subordination of a tax penalty in the absence of government misconduct.  The Supreme Court . . . refused to decide whether misconduct is required under § 510(c), [but held] that "categorical" subordination [of tax penalty claims] is not permissible.") (citations omitted).

The Third Circuit in Citicorp I similarly did not "resolve the issue of whether misconduct is always a prerequisite to equitable subordination because the bankruptcy court properly found misconduct" in that case.  160 F.3d at 987 n.2.  Similarly, in SubMicron, the Third Circuit did not reach the issue of whether inequitable conduct always had to be established before a

21

claim may be equitably subordinated because the district court had found that no injury resulted to the unsecured creditors. 432 F.3d at 462.

In its most recent decision addressing equitable subordination, however, the Third Circuit expressly adopted all three parts of the <u>Mobile Steel</u> test and affirmed the bankruptcy court's findings of the requisite inequitable conduct.  <u>See</u> <u>Winstar</u>, 554 F.3d at 411-13 ("'[T]hree conditions <u>must</u> be satisfied before exercise of the power of equitable subordination is appropriate:' (1) '[t]he claimant <u>must have engaged in some type of inequitable conduct</u>;' . . . .") (emphasis added) (citations omitted).  Therefore, the Court concludes that binding Third Circuit precedent requires that a claim for equitable subordination must include evidence of some type of inequitable conduct.

A majority of courts from other jurisdictions agree.  <u>See</u> <u>Wooley v. Faulkner (In re SI Restructuring, Inc.)</u>, 532 F.3d 355, 364 (5th Cir. 2008) ("[There is] no finding that the [creditors] breached any obligations to the company or its creditors or that they engaged in inequitable conduct of any kind in connection with [their] loan. . . .  Accordingly, the . . . order equitably subordinating [the creditors'] claims is reversed, and judgment is rendered in favor of [the creditors]." ); <u>Fairchild Dornier</u>

22

GMBH v. Official Comm. of Unsecured Creditors (In re Dornier
Aviation (N. Am.), Inc.), 453 F.3d 225, 231 (4th Cir. 2006) ("A
bankruptcy court may alter the priority of an allowed claim via
equitable subordination . . . if it finds that the creditor
engaged in inequitable conduct. . . .  In the case at hand, the
bankruptcy court found that equitable subordination was
inappropriate because there was no evidence of GMBH engaging in
inequitable conduct.") (citations omitted); Sender v. The Bronze
Group, Ltd. (In re Hedged Invs., Assocs.), 380 F.3d 1292, 1298
(10th Cir. 2004) ("Appellants have not shown Bronze Group engaged
in sufficiently culpable conduct to qualify for equitable
subordination.  In order to make a prima facie showing of
inequitable conduct, Appellants must 'present material evidence
of unfair conduct,' and demonstrate some culpability on Bronze
Group's part.") (emphasis added); Bayer Corp. v. MascoTech, Inc.
(In re Autostyle Plastics, Inc.), 269 F.3d 726, 747 (6th Cir.
2001) ("Undercapitalization alone is insufficient to justify the
subordination of insider claims, however.  A finding of
inequitable conduct requires more than a showing of
undercapitalization.  There must be evidence of other inequitable
conduct.") (citing Blasbalg v. Tarro (In re Hyperion Enters.,
Inc.), 158 B.R. 555, 563 (D.R.I. 1993)); In re Lifschultz Fast
Freight, 132 F.3d 339, 348 (7th Cir. 1997) ("The rule is that

equitable subordination is predicated upon creditor misconduct . . . .”). Accordingly, the Court concludes that evidence of some type of inequitable conduct is required to subordinate a creditor's claim.

In the instant case, the Committee alleges that Kluge, an insider of MSC well aware of MSC's distressed financial condition, disguised advances extended to MSC under the Kluge Note as a loan rather than an equity infusion when MSC was grossly undercapitalized. The Committee further alleges that the "debt" under the Kluge Note was never disclosed to MSC's trade creditors.

The issue is whether the allegations of an insider's loan extended to an undercapitalized company are sufficient to constitute inequitable conduct. Courts are split on the issue. The Fifth Circuit has suggested that the combination of an "insider" and "undercapitalization" may be sufficient to state a claim for equitable subordination. See Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.), 2 F.3d 128, 131-32 (5th Cir. 1993) ("Even though undercapitalization alone generally does not justify equitable subordination, . . . if an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court . . . to equitably subordinate the loan to

the claims of other creditors.") (emphasis added).

The Sixth Circuit, however, has held that "[u]ndercapitalization alone is insufficient to justify the subordination of insider claims . . . ." See Autostyle Plastics, 269 F.3d at 747, 745 (emphasis in original). Explaining its holding, the Sixth Circuit stated that "[c]laims involving insiders 'are not automatically subordinated' since 'insiders are the persons most interested in restoring and reviving the debtor, and such bona fide efforts should be viewed with approval.'" Id. at 745. Most Circuits agree with the Sixth Circuit's conclusion that mere undercapitalization is insufficient to subordinate an insider's loan. See, e.g., Hedged Invs., Assocs., 380 F.3d at 1298 ("While HIA was most assuredly 'undercapitalized' at the time of the Bronze Group loan, mere undercapitalization also falls short . . . . Even if we were to consider the Bronze Group an insider of HIA, Appellants have not shown Bronze Group engaged in sufficiently culpable conduct to qualify for equitable subordination."); In re Lifschultz Fast Freight, 132 F.3d at 347 (holding that a debtor's undercapitalization by itself does not justify subordination of an insider's claim without misconduct or inequitable conduct by the insider).

Several courts have cited "three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud,

result

25

illegality, and breach of fiduciary duties; (2)
undercapitalization; or (3) claimant's use of the debtor as a
mere instrumentality or alter ego," but none of them has found
that undercapitalization alone is sufficient.  See, e.g., Herby's
Foods, 2 F.3d at 131-32 ("As stated, undercapitalization alone
generally is insufficient to justify equitable subordination. . .
.  We need not decide, however, whether the combination of
undercapitalization plus merely the late perfection of security .
. . constitutes sufficient inequitable conduct to support
subordination; the Insiders herein did more.") (emphasis added);
Fabricators, 926 F.2d at 1467-70 ("[I]t is clear that
undercapitalization was not the sole reason for equitably
subordinating TFI's claims in light of TFI's other inequitable
conduct as described above.") (emphasis added); In re Mid-
American Waste Sys., Inc., 284 B.R. 53, 70 (Bankr. D. Del. 2002)
(holding that criminal conduct of the debtor's former president
and chief executive officer resulting in substantial expenditures
to the debtor warranted equitable subordination of the former
president's claim).  No court, to the Court's knowledge, has ever
actually held that mere undercapitalization is sufficient to
subordinate an insider's loan.[4]  Without exception, courts

---

[4] Though many courts have stated that undercapitalization may be
enough, the statements were dicta.

granting the remedy of equitable subordination have found some type of inequitable conduct.  <u>See, e.g.</u>, <u>Herby's Foods</u>, 2 F.3d at 132 ("The Insiders never injected any equity capital into Herby's, electing instead to advance funds through tardily perfected secured loans made at times when no bona fide third-party lender would have done so.  With full knowledge that Herby's was undercapitalized and insolvent, the Insiders [advanced] money only [as] loans."); <u>Citicorp I</u>, 160 F.3d at 988-90 (affirming equitable subordination of claims purchased at a discount by a fiduciary of a debtor postpetition where the purchaser breached its fiduciary duty); <u>Mid-American</u>, 284 B.R. at 70 (finding an insider's criminal conduct was inequitable).  Thus, the majority of courts agree that undercapitalization alone

---

It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.  The reason of this maxim is obvious.  The question actually before the Court is investigated with care, and considered in its full extent.  Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

<u>Cohens v. State of Virginia</u>, 19 U.S. 264, 439-40 (1821).

is insufficient and "some type of other inequitable conduct" is required.  See Winstar, 554 F.3d at 411.

While both MSC's "undercapitalization" and Kluge's "insider" status may have enhanced Kluge's ability to engage in inequitable conduct, the Committee has not alleged any such misconduct.  The Committee's allegation that Kluge failed to disclose the "debt" under the Kluge Note to MSC's trade creditors is not dispositive. The trade creditors could have discovered the debt under the Kluge Note by reviewing MSC's audited financial statements.  See, e.g., Autostyle Plastics, 269 F.3d at 747 ("The fact that [a creditor] was not aware of the defendants' lien position because [the creditor] did not conduct adequate due diligence does not justify equitably subordinating the defendants' claims."). Therefore, the Court cannot find that the Committee has alleged sufficient facts to pass the first prong of the three-part test for equitable subordination.

2.  Injury to Creditors or Claimant's Unfair Advantage

With respect to the second prong, the Committee alleges that Kluge's misconduct caused substantial harm to the general unsecured creditors of MSC by increasing Kluge's potential recovery and proportionately decreasing the amount of funds available to pay the general unsecured creditors.  The Committee alleges that as a result of the Kluge claims (approximately $224

28

million), MSC's general unsecured creditors will have to share their recovery with Kluge.

However, the Committee's conclusion that the Kluge claims caused harm to MSC's creditors does not mean that actual harm resulted.  See Iqbal, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  Indeed, lending money to MSC is quite different from causing "harm" to the debtor.  See, e.g., Mid-American, 284 B.R. at 75-77 (finding that claimant's misconduct caused, inter alia, significant legal fees, inability to increase the amount of the debtor's directors and officers liability insurance, and significant problems with government regulators).  The assertion that the Kluge loan increased claims against the estate (thereby reducing unsecured creditors' recoveries) is insufficient to support a finding of harm because the funds advanced under the loan were used to pay off the secured debt under the MSI Credit Agreement, thereby benefitting the unsecured creditors.  Further, the Committee has failed to show that Kluge obtained any unfair advantage because Kluge, an unsecured creditor, is in the same position as the other general unsecured creditors, set to share the same "pot" available for distribution to unsecured creditors.  Thus, the Court finds that the Committee's allegations are also

29

insufficient to pass the second prong of the test for equitable subordination. See, e.g., SI Restructuring, 532 F.3d at 361 (holding that loans provided by insiders to the debtor to pay trade creditors could not be equitably subordinated absent actual harm to the company).

Therefore, the Court will grant the Motion to dismiss the Committee's claim for equitable subordination, without prejudice to its right to amend the Complaint to the extent it can allege additional facts that support such a claim. See Fed. R. Civ. P. 15(a), incorporated by Fed. R. Bankr. P. 7015.


IV.   CONCLUSION

For the reasons set forth above, the Court will deny the Motion to Dismiss the claim for recharacterization and will grant without prejudice the Motion to Dismiss the claim for equitable subordination.

An appropriate Order is attached.


Dated: August 21, 2009           BY THE COURT:

                                 Mary F. Walrath
                                 United States Bankruptcy Judge


30